Our next argument case this morning is number 2011-1171, NU-WAY CONCRETE v. Department of Homeland Security. We're going to start with Mr. Gilmour, the attorney for NU-WAY, the appellant from Orlando, Florida. My client, NU-WAY, is a Kentucky corporation, a small company that had done business with FEMA since 1975, had a 98% approval rating, had done a lot of work on emergency contracts. This contract arose out of the 2004-05 hurricane episode that happened in Florida, where Florida hit with four hurricanes. NU-WAY was a company that historically, going all the way back to Hurricane Andrew, had gone out and placed temporary housing, which amounted to mostly trailers and park trailers and that sort of thing, and it maintained them while the people were living in, trying to get their houses rebuilt. And at the end of that contract, they would go out and deactivate them and bring them into a station area. NU-WAY had a lot of experience in doing this sort of thing. Unfortunately, during this time period, it was a time period where there was a lot of trailers would be taken, and how clean they wanted those things to be, and how repaired they wanted them to be, versus what NU-WAY had signed on to, which was a wipe-down contract. Well, what had NU-WAY signed on to? What does the contract say about the inspection standard? The scope of work was a wipe-down contract. No, no, but specifically, what did it say? I don't have the exact language, but they were to go out and deactivate a trailer. Is it in the appendix? I believe it is in the scope of work in the appendix, Your Honor. But the company was to go out... I had a discussion in the briefs about what the inspection standard was part of the process. Well, there's a letter that was issued by Gail Coker, who was the contracting officer, defining what they had to do, and it did not include a thorough clean. And that's what came up between these parties, was the logistics staff was requiring a thorough clean, and the contract they signed on required a wipe-down, which they would go out to and testify by... How do I know what the contract really said, a wipe-down? How do you know it was a wipe-down? Yeah. I don't know if I'm going to be able to find that in the amount of time allotted, Your  The letter that was issued by Mr. Ken Miller, which is in evidence, indicated that it was a wipe-down contract, and that they were required to do a thorough clean. I mean, that's the whole issue that popped up. The whole issue is what the contract said, that's the starting point. We know what the contract said. I don't know how we can make a judgment as to whether you proved that the contract requirements were exceeded. Well, why don't you tell us what you believe was required, what NUA was required to do that they shouldn't have had to do? Well, under their contracts, what they call in the business a wipe-down contract, where they go out with a pickup truck, pull the blocks out from underneath one of these temporary mobile homes, they're trailers, really, and do a wipe-down. They go in, they have to flush the toilet, they have to... Remove excess sewage and water. Exactly. A lot of these trailers that they used to use didn't have any kind of a septic tank in them. They would just go right from the toilet straight out, and then they would dump out that way, so there was no septic tank. Dump outside? No, they would go into a sanitary sewer. Okay, all right. It wasn't that bad. But they would go into a sanitary sewer. But they had so many hurricanes hit, they had to go out and buy trailers that actually had a holding tank in it, and that's where some of this problem popped up. But they were requiring, the testimony by Mr. Miller said that they were requiring to scrape off and clean and get chemicals and take off baked-on goods and stuff like that, like on the stoves, and do thorough cleaning, what amounted to a thorough cleaning. That's what the contracting officer's letter addressed, and she sent that to the logistics staff. But the testimony showed that they never really followed that. The logistics staff continued to require... What the board says on A11 is the only evidence, and this is your evidence, about that they were improperly rejecting units and so forth for not having additional stuff having been done to them. The only evidence consists of generic anecdotal testimony from Newey and subcontractors that they had to do additional work on the units. Newey failed to present any persuasive or sufficient evidence to show the government actually compelled it to perform additional work. So what's your best evidence that the government actually compelled you to do additional work? The best evidence is Ken Miller's testimony plus the bills they incurred for doing the extra work. For instance, they had to rent lots where they had to go and bring these to a separate staging area to clean them. They had to build septic systems there because they were using so much water to do a thorough cleaning. All that evidence was presented. But if I can back up... Well, but we're not... I mean, the board reviewed all this evidence. I think they referred to the documentation you gave them as organized chaos, and I don't think they felt that they could adequately support your arguments with the kind of documentation you provided. Why are they wrong about that? Because, Your Honor, I think they're actually... We presented evidence. We're talking about a rural Kentucky corporation. It's not a large, sophisticated corporation. The evidence and some of the receipts had mistakes in them. I'll admit to that, that it would be possible to look at some of the evidence and say... And Mr. Miller on the stand said, yeah, that's probably... That receipt shouldn't have been in there. That's from the wrong year. We're talking about 2,700 units over the period of a year. So it's a long time period. It's a lot of work. It's a lot of receipts they brought in in three large binders. But if it gets down to an issue, the reason I brought this appeal, Judge, was because the language of this appeals court, or the board judge, is basically there's no evidence by new way. And there was evidence by new way. But here's my biggest question, and I certainly want to let you answer that question, but the only person who can force you to do this additional work is the contracting officer. So if 50 other random government employees tell you, you got to do more work, but they're not the contracting officer, they don't have the authority to approve it. It's a really seemingly unfair legal doctrine when it comes to small contractors like you're referring to, but it is the law that we have no choice but to follow, that the only person who has the authority to bind the government to additional fees is the contracting officer. And in this case, I thought the claims court was looking and saying, there's no evidence that the contracting officer told you to do these additional things, and in fact, when you brought to his attention, or when your company did, the fact that more things are being required, he said, don't do them. Do not do any additional work. And that was the record evidence with regard to what the contracting officer authorized and or required you to do. And that's, I think, you may be right that there's some evidence that some people told you to do things, but they're not the people who have the authority to bind the government to more money. And so how do you respond to that? I agree with you, Judge, what you're saying. It was the logistic staff who were not authorized, they were not contracted officers, that required the extra work. However, if you go back to the institutionalized ratification elements, the contracting officer, Gail Coker, and the head contracting officer, Mr. McCreary, who at page 844 in appendix 444 states, the question was, in your understanding, did you see the memorandum by Mr. Jeffrey Harrison that talked about, it didn't appear that Gail Coker's letter, that was her letter trying to correct things, in her efforts to fix this work, answer yes, okay, so you would agree that somehow the people at staging were still continuing to ask Newey and other contractors to do more extensive cleaning and repairs and this sort of thing, you understand that, right? He says yes. He was, McCreary, who was up here in Maryland, that was the chief contracting officer. So in an institutionalized analysis, the unauthorized party is the logistic staff. They're saying do this extra work or we won't accept the trailer. But when the contracting officer, who in her deposition and her testimony admitted she's the one that can change the contract, she's the one that has to authorize that, she would be the party. She knew that they were asking them to continue to do more extra work. Therefore, that comes up to the level of an institutionalized ratification. But did she say she knew it at the time? Afterwards. No, she knew it when it was going on. She wrote the letter to logistics, they have meetings with logistics, they tried to fix it. It didn't work. Logistics continued. In fact, there was testimony where logistics pretty much said we're going to do what we want to do. Well, how do we know it's extra work? I mean, it's up to you to show what the contract required and that something beyond that was demanded in these inspections. And what's your evidence of that? I mean, you can't even point out what the contract required. Well, the contract, it's in the scope of work on the contract. You can't even, you don't show it to us. I mean, how do we... It's attached to the complaint. You say it's a wipe down as opposed to a thorough cleaning. I mean, that's the first and essential part of your argument, is that you only had to do a wipe down. You've got to establish, where did you establish that the contract only required a wipe down? I can't point to it in this 10 minutes, Judge. But it's there. It's in the record on this appeal, Your Honor. That's what counsel always says. It's there. If I can back up, there's one point I want to be sure to make, and I came down here today just really in oral argument to make sure that this was understood. Both the original contracting officer who wrote the first decision, Linda Whitmer, and then Mr. Creary, the second contractor to make a decision letter, and then now the judge, and then including the brief by appellee, they all get hung up on this idea that when you take a trailer in and it gets rejected, supposedly a rejection slip gets put together and it comes out on the computer record. In the crunch of all these hurricanes and all these trailers, those written records weren't being made, number one. Number two, if it got to a place where every time Newey took a trailer and they said, we're not accepting this, you've got to do a thorough clean, they'd send them away. That was in Mr. Miller's testimony. So then they go and they completely clean it. He writes a letter to Coker saying, I'm not supposed to do this thorough clean, right? She writes a letter back saying, right, you're not supposed to do thorough clean. That's not in the scope of your work. Who wrote the letter? Coker, the CO. She wrote him a letter. Where's that letter? Coker letter. I think it's 696. But the point being, the point I want to make, Your Honors, is that there aren't rejection records and each one of the CO decision letters and then the judge's decision letter, they come back and do this analysis that since there's no computer rejection letter, that there were no problems with the trailer. She says on 696, she says, the intent of the contract is to return units to a staging area in reasonably clean condition. Okay? Let's assume that that's the contract standard. What's the evidence that more than that was required? All the testimony by Mr. Miller and all the receipts showing all the extra things they had to do, which the record was just replete with that kind of testimony. And the government never brought any testimony in that said we didn't have to. In fact, the government... Well, this letter that you just referred us to, maybe I'm misunderstanding, but this letter that you just showed us, 696, the last sentence in the second paragraph says, since this is not a refurbishing contract, we will encourage you are only required to remove debris and food stuff in the form of a non... So, is this the issue? I mean, are you complaining that you were required to do the last two things? It seems to me clearly... Do you take issue with what she's telling you to do as being outside of the contract? No. What she's saying is right. What happened was... Okay, so she's right, but my understanding is that some of the rejections were for failure to clean out the holding room. Very few of them. Well, how do we... From the testimony of Mr. Ken Miller, who was the manager on the contract... Did he point to any specific units where there was an extra requirement? He did not tie a bill to a unit, and I don't think that makes our claim fail, Your Honor. Going back to these computer records, each one of these people, Linda Whitmer and Mr. McCreary, and then finally the judge, argues that since there's no data computer file that was required for the work, there were no rejections, therefore we don't have a claim. But what I want to make clear is that after these letters were written to logistics, that Newey would take these trailers in saying, COCA wrote these letters. We have to do a wipe down, not a thorough clean, and say, no, go thoroughly clean it, take it back. So there's a letter from Miller back to Newey saying, we're continuing to have to do a thorough clean, so the only way we're going to get these accepted is to do a thorough clean. And so there's no rejection record because they did the thorough clean. And for some reason, that analytical point seems to not stick with either the contracting officer or the trial court judge. And then finally in the brief of Aptly, they say since there's no rejections, they didn't do extra work. There's no rejections because we did do the extra work. That's a really important point, underlying point in analyzing this case. But going back to Judge Moore's question, who told you to do the extra work? The logistics staff. COCA is the CEO, and those people have the authority. But they knew, COCA knew these guys were requiring us to continue to do extra work, and they never stopped it. Where is that evidence exactly? Because the only thing, the letter on 696, she said, do not do anything else. And then I understand there is some evidence that suggests she went and had communications with the logistics people telling them not to require you to do additional work. It may not have been successful. You may still have been required. But she is the contracting officer, and all the evidence that I can see is evidence that suggests she tells you not to do additional work and tries to help make sure you don't have to. If you look at Appendix 542, it's in her testimony. COCA says, did you ever see the letter from Ken Miller where he was claiming that a ratification occurred and asking for 800 per unit answer? I'm not certain. Question, did you during the time period that you were there as contracting officer ever send to NUA, either to Mr. Miller or Mr. Lay, another member of NUA, a letter rejecting any claim for 800? I don't recall. Were you aware that at least Mr. Miller was claiming that he was doing additional work at the time period of your letter of interpretation? Is that correct? Yes, he continued to complain about additional work. Are we getting to the relevant testimony, or is that the testimony? No, that's the testimony. The testimony is she's aware that he's complaining he's having to do additional work. And she sends a letter telling him he doesn't have to do any additional work and he shouldn't do it. So I don't see how that ratifies, even if the logistics people are completely, even if everything you're saying is completely accurate, and I have no reason to disbelieve you, the logistics people are requiring NUA to do it. And NUA went ahead and did it because it's a lot more of a hassle to deal with the logistics people than it is just do the work. I get all of that. But the problem is it's the ratification. I don't see the evidentiary basis for ratification. And unfortunately, like I said, in government contract law, the only person that can bind the government is the CO. And that's the evidence that I just am missing. Your Honor, in response to that, just back over on page A444, where I cited Mr. McCreary's statement. 444. Yeah, down at the bottom of the page. Okay, so you would agree that somehow the people at Staging were still continuing to ask NUA and other contractors to do a more extensive cleaning and repairs, that sort of thing. You understand that, right? And he says, yes. That's McCreary. He's the head contracting officer that was entitled over the entire contract and wrote the final letter. But that's such a vague testimony. That's the problem that the Board had. Where does he even say specifically that they required us to do X and that wasn't required by the contract? That would be in all the testimony by the contractors. The government didn't bring any testimony. Where is the testimony that the government inspectors went beyond what the contracting officer described as the contract requirements? Well, that would be part of it right there. Well, there's no reference to the standard that the contracting officer articulated. It's just they say extra work, you know. Their view of what's extra work and the contract's view of what's extra work aren't necessarily the same thing. But as the evidence came in from the contractor in our primary case, Mr. Miller went through each point and that was all before the judge saying we had to rent lots, we had to rent equipment to do a thorough clean, chemicals, we had to build the septic system because we're using so much water doing a thorough clean. We had to take units back and forth. That was all substantial evidence before the court. FEMA did not bring in any evidence to refute any of that. So as I understand the scope of what the judge has to look at, she basically came in with a no evidence ruling on these sort of things saying that there was one part that I want to quote at page 46. The court said, did not present any documentary or testimony evidence whatsoever that substantiates or supports its cost claims. And that goes to the cost claims. But what bothered me about the decision of the court below where I think she made a legal and reversible error was she's finding that we didn't have any evidence. We brought in huge books. Now, admittedly, it wasn't very clean evidence and there was mistakes in it. But as I understand the case law, the fact that it's not perfect doesn't mean we brought in evidence. I think Mr. Gilmour, you're out of time. Oh, he's got two minutes for rebuttal. I reserve two minutes for the... I give you two minutes for rebuttal. Thank you. Your time is expired. Mr. Regner, am I pronouncing that correctly? Yes, Your Honor. May it please the court. There's really three issues. I'll try and address them in logical order and address the factual findings because I think we have to get past that before we can even have discussion about the possibility of ratification. What we don't have in the record is any showing that Newey was instructed to do extra work. There's no, here's the trailer, here's what the work was, and here's what it cost us. What we do have in the record is what appears to be Mr. Miller, who was Newey's CEO, his misunderstanding of what the contract required, and that misunderstanding was carried over to page nine of Newey's brief before this court. It was his belief that it was merely a wipe-down. The scope of work is actually... Do you agree that the scope of work is correctly described by the contracting officer on 696? Yes, it's not as complete. Yes, it is correct, although it's not as wordy as the contract. Where's the contract provision? It starts at page 669, runs to 672 in the appendix. It's four pages from the contract. And what that section requires, among other things, is that the contractor ensure that the commode and sanitary line were free of sewage. That's on page 669. That the units be winterized, which includes all water removed with air pressure. That's at page 670. That the units be cleaned and fumigated. That's at 672. That trash and personal effects be removed at 672. You can see I'm skipping over a lot of the other requirements that aren't at issue, but it was quite a detailed scope of work, and there was no question as to what that actually was. And in addition, on page 677, the contractor was also required to transport the units up to 150 miles from the FEMA, from the location wherever they were, to the FEMA lot. What we also have in the record with respect to the suggestion of extra work is simply anecdotal evidence, and this is what the board picked up on, is the anecdotal evidence, which when you add it all up together, reflects about 20, probably less than that because there appears to be some overlap, some 20 units that may have been rejected because primarily sewage not being removed from the holding tanks and the sewage lines. But that was a contract requirement, right? It absolutely was a contract requirement. And the testimony was that they thought that went beyond the contract? Well, that was Mr. Miller's testimony because he believed only a wipe-down was required, and clearly more than that was required. What the inspectors were doing was simply enforcing the contract, and that's why I start with Mr. Miller's misunderstanding. Isn't there some record indication that there was an awareness that maybe somebody was telling the contractor to do more than he necessarily had to do under the contract? It may have been anecdotal, but there's some evidence that he was required to do more. At least his work was being rejected. There's no question that the contracting officer was receiving complaints from Mr. Miller that he was being required to do more than he believed was required under the contract. The contracting officer obviously wasn't standing there at the inspection stations, and so she had to do something, and that's when she took several affirmative steps. One was to meet with the logistics group and explain to them, here's what ought to be inspected under the contract, to communicate to Mr. Miller through the letter that we've already looked at, at page 696 in the record, saying, all you're required to do is what's in the contract, and here's what the contract says. She did everything she could to protect this contract. Wait a minute. She says, look, on 696, she says, this is not a refurbishment contract. Legal concurs you are only required to remove debris and food stuff, perform a reasonable wipe down, sweep non-carpet floors, vacuum carpets, and clean out holding tanks. So that's her letter, the contracting officer's letter. So how does that equate to they had to remove stuff from the sewage, whatever? It seems to me those 20 instances, you just told Judge Dyke anecdotally that those 20 instances also required work that was required under the contract. But it seems to me, based on her disclosure of what's required under the contract, that extra work, at least for those 20 instances, is beyond the contract requirements as she articulates. No, she's articulating what the contract requires. She says clean out holding tanks, etc., and she's responding to a specific question from Mr. Miller about what is required in these instances. And so she's saying that among the other things that you have to do were clean out the holding tanks, but that's what you're limited to. Look at the contract. And that's all that the inspectors were trying to enforce. If you look at the... What was, with respect to the 20 instances, what do they say was required that wasn't required by the contract? The 20 instances that New Way cites to are located at page 771 to 76 in the record. And there are less than 17, or it could be 17 issues of removing sewage. Things in the holding tanks in particular seems to be the prevalent. And then there was three issues of cleaning issues in the living spaces, things that she's describing here. Sweeping non-carpet floors, vacuuming carpets, and then she also addresses clean out the holding tanks, which was the primary issue in the anecdotal evidence. Just to repeat, you're saying the contract did... He was required under the contract to remove all sewage and water from the sewage system? Yes. That was the contract requirement? That's correct, Your Honor. The four pages of the contract detail exactly how you go about cleaning out the sewage tanks. And it says to use pressurized air and to get the unit dry. She has to shorthand it, just saying clean out the holding tanks, because that's what was at issue. The dispute in the record was not whether the sewage lines had to be clean. It was whether those holding tanks as part of the sewage lines had to be clean. And she was saying, yes, that answering Mr. Miller's question, that is what had to be clean. And that seemed to be a dispute at the inspection station. Other than that, there didn't seem to be any divergence between what the contracting officer required and what the inspectors required. No, the inspectors were simply requiring the contract, requiring enforcement of the contract which is the same as what Ms. Coker was saying, which is the same as what's in the four pages of the contract. There's no distinction between what was happening in the field and what was required in the contract. The dispute was between in Mr. Miller's mind what a wipe down meant and what was actually required in this contract. And so that's why we had this issue in the first place. And New Way points out that you can see that the evidence in the receipts and cost evidence that they introduced. But if you look at that, what they actually introduced was costs that were incurred, if we focus just on 2005, because a lot of the costs were outside of the relevant year. If you just look at those costs, it's to do the contract work. It's to clean out the sewage tanks, to do the basic sweep down. And we've set out the what he's charging for to the extent we can even understand it. It's simply for contract work and nothing more. New Way cites, and we heard an argument, testimony from Mr. McCreary, which is at 444, spilling over to 445 in the record. And Mr. McCreary, what he's testifying to was yes, that New Way was being required to do more work. But it was more work than what they were performing, not more work than what was in the contract. If we look at exactly what Mr. McCreary says, that's the distinction he's making. The court referred to his vague testimony, but that's the vagueness in that testimony. What does he mean by extra work? He's saying more work than what you're doing, not more work than what's required. More work than what's required in the contract. And if we go to page 496, also in the record, again, still Mr. McCreary testifying. He explains a question, at the time you submitted the information you have, would you have recommended a ratification? And the answer was, with the information that I had at the particular time, I would not have recommended a ratification. So he's clearly saying that no, they were not doing any extra work. With respect to the damages information that New Way presented at the trial of this case, what it actually submitted was a stack of unsubstantiated tallies, these adding machine tapes, and miscellaneous checks and receipts that couldn't be tied back to what was actually done in any particular unit or during a particular scope of work. What the damages really included was simply base contract work. And Mr. Miller admits as much, the CEO of New Way admits as much at page 179, says yes, some contract costs were mixed in. We would go a little bit further, and I think what the board observed was that the largest section of those costs was for septic and pumping work, precisely cleaning out the holding tanks, which is in the contract and what Ms. Coker echoed. And that's at page 751 to 552 in the record. The unsubstantiated tallies, we pulled out a couple examples of the adding machine tapes. That's what you saw. If you were sitting at the trial, it was just those adding machine tapes. You can see on the Xerox that there might be some receipts peeking out from behind it. Those receipts were never put in the record. So we don't know what those tallies were. We don't know what the work was, what the time period was. And we can tell, for example, from the gas charges, they range from $1 to $6,000. They certainly were not for what they represented to be. Nobody bought $6,000 worth of gas in a single fill-up. For those reasons, the findings of the board were correct. The board found that New Way was not instructed to do any additional work and that it did not present evidence of its costs. And for that reason, the board was correct in that its findings are supported by the substantial evidence. With respect to ratification, the board made a couple of findings with respect to ratification. There was no unauthorized commitment and that the contracting officer did not allow the benefits to be accepted. Clearly, the contracting officer did not. I've already covered the actions of the contracting officer. And there was no unauthorized commitment by the field people. They were simply enforcing the contract. And for that reason, this court should also affirm the board's decision on ratification. And we'd ask that the board's decision in entirety be affirmed by this court. Thank you, Mr. Reagan. With regard to the evidence on damages, opposing counsel has pointed out probably our worst evidence we had there. And there was a large volume of evidence. Those cash-registered receipts were very used. There's no way for the court to have taken that. The court could have locked that out, though. There was some specific evidence. They testified they hired X amount of subcontractors at $400 per unit to do the extra work. Because the subcontractors that are testified were going to leave because they couldn't make the contract pencil out on their receipts. Do you have specific evidence of the number of units they were working on? They testified to the 2,700 units, Your Honor. But they testified they had to do pretty much all of them. They had to do extra work. Every once in a while there'd be one that was easy. Nobody had lived in it, for instance. But the next one they would get would be... But see, there was no evidence. Did anybody sit down and say, okay, here's the contract requirements. Here are the specific things that we were required to do over and above the contract requirements. Did you have such testimony? Yes. When he said we had to go rent lots to do our own staging area, when he said we had to go build the septic tank and the cost for that, when he said we had to pull them back and forth, that was all direct testimony about damages. That's evidence about cost, not evidence about what the inspectors required over and above the contract. Absolutely. Mr. Miller testified in his testimony. I can't pull it right up right here, but Mr. Miller testified the different things that were required to do that are not a wipe-down. The one I remember distinctly is going and having to get chemicals and clean-off baked-on foods on the stoves. You don't do that under wipe-down. You just get the larger... Well, but the contract said you had to remove all food debris so that the place would be preserved for the future. Why wouldn't burnt food on a stove be food debris? It's usually that's within the contract. That's a thorough clean. And there was testimony about what is a thorough clean. The contract doesn't use the word wipe-down. The contract that he pointed us to says cleaning, removing all food debris. It doesn't use the words wipe-down. I think one of Coker's letters uses the actual words wipe-down. Well, she says this is not a sanitation issues that would be present in a refurbishment don't need to be performed. And she does use the word wipe-down, but I don't know. I wouldn't leave burnt food debris on my stove and I wouldn't consider myself to be a super great cleaner either, by the way. We talked about baked-on things versus they want you to go in and get all the big food that doesn't deteriorate or draw rats or roaches. They want you to get all that off. But baked-on, you know, pumpkin pie, whatever. I don't want that left on my stove. Yeah, but they don't have to scrape that off. But they were making them do that. That was in the testimony. So it wasn't like we just kind of threw it out. He went through and said these are the things that are required. These are not in a wipe-down contract, which historically we've done wipe-downs. The contract doesn't just use the term wipe-down. It's very specific about all the things that have to be done. The contracting officer says wipe-down, but she uses that only as one of several things that have to be done. The problem is you don't have any testimony by somebody saying I'm familiar with the contract requirements. Here are the things that were required that weren't in the contract. We do have testimony of that from Newey. And they don't have testimony. I think they agree. The letters from Koch are back to logistics just telling them you are going over beyond the scope, guys. And they didn't get it corrected. The last thing I would want to... We're out of time. Thank you, Mr. Gilmore. Thank you.